**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| | : | |
| **v.** | : | **No.    21-CR-00427-01** |
| | : | |
| | : | |
| **JOSEPH CAMMARATA** | : | |
| | : | |

**MEMORANDUM**

KENNEY, J.                                                                                    May 30, 2023

On October 26, 2022, a jury returned a verdict finding Defendant Joseph Cammarata ("Cammarata") guilty of conspiracy to commit mail and wire fraud (Count One); four counts of wire fraud (Counts Two through Five); conspiracy to launder money (Count Six); and two counts of money laundering (Counts Eleven and Twelve). ECF No. 194. Presently before the Court is Cammarata's *Pro Se*/Hybrid Supplemental Motion for a Judgment of Acquittal under Rule 29 of the Federal Rules of Criminal Procedure, or in the Alternative, a Motion for a New Trial under Rule 33 of the Federal Rules of Criminal Procedure (ECF No. 264),[1] which has been fully briefed

---

[1]      Initially, the Court granted numerous motions for extensions for the filing of post-trial motions. It later became apparent that the motions for extensions were filed because there were strategic differences between defense counsel, Cohen Williams, LLP ("Cohen Williams"), and Cammarata in drafting such a post-trial motion. On February 6, 2023, this Court held a hearing concerning Cammarata's representation, where Cammarata and Cohen Williams indicated they were satisfied with proceeding by way of hybrid representation in post-trial motions and at sentencing. Accordingly, the Court permitted Cammarata to proceed by way of hybrid representation and to file his own *pro se* post-trial motion, while Cohen Williams rested on its prior Rule 29 Motion submitted on October 24, 2022 following the close of the Government's case at trial, and the oral preservation on the record during trial. For a detailed review of the moving parts with respect to Cammarata's representation, *see* ECF Nos. 261, 284.

(*see* ECF Nos. 267, 274). For the reasons set forth below, Cammarata's Motion (ECF No. 264) will be denied. An appropriate Order will follow.

## I.       FACTUAL BACKGROUND & PROCEDURAL HISTORY

On October 28, 2021, a grand jury returned an indictment charging Cammarata, Erik Cohen, and David Punturieri (collectively, "Defendants") with conspiracy to commit mail and wire fraud related to a scheme to defraud securities class action claims administrators (and the parties to the underlying settlements for whom they worked out) out of more than $40 million. ECF No. 1. On November 3, 2021, Cammarata was arrested at the Miami International Airport as he returned from Bogotá, Colombia. Although he was originally released on numerous conditions, subsequent events led to Cammarata's bail being revoked on March 10, 2022.[2]

Thereafter, on September 8, 2022, a grand jury returned a superseding indictment charging Defendants with the following twelve counts: one count of conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349 (Count One); four counts of wire fraud, in violation of 18 U.S.C. § 1343 (Counts Two through Five); one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count Six); four counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) (Counts Seven through Ten); and two counts of money laundering, in violation of 18 U.S.C. § 1957 (Counts Eleven and Twelve). ECF No. 108.

---

[2]       Throughout his post-trial submissions to this Court, Cammarata discusses the facts concerning the revocation of his bail and argues that the agents who arrested him engaged in misconduct. A full recitation of the facts concerning Cammarata's pre-trial detention can be found in this Court's September 15, 2022 Memorandum denying Cammarata's Motion for Reconsideration of Court's Order Granting Pretrial Detention. ECF No. 113. On September 22, 2022, Cammarata appealed this Order denying his Motion for Reconsideration (ECF No. 118), which the Third Circuit denied on October 3, 2022. ECF No. 131. This Court will not consider (for a third time) Cammarata's arguments regarding the revocation of his bail in this Memorandum as these issues have no bearing on the integrity of Cammarata's trial.

As alleged in the Superseding Indictment, Cammarata, Punturieri, and Cohen controlled and operated Alpha Plus, a claims aggregator, and used Alpha Plus to submit claims on behalf of purported clients "who claimed entitlement to settlements from securities class action and SEC enforcement action settlements." ECF No. 108, Count One, ¶ 11. The Superseding Indictment explains that Defendants, through Alpha Plus, submitted claims to administrators that falsely represented that three entities—Nimello, Quartis, and Invergasa—had purchased and sold the securities that were the subject of the securities class action settlements that the claims administrators were responsible for overseeing. *Id.* ¶¶ 16, 19, 22, 27. While these three entities were purported to be independent clients of Alpha Plus, they were in reality owned or controlled by Defendants. *Id.* ¶ 24. In their communications with claims administrators, Defendants supported their false representations of securities ownership by Nimello, Quartis, and Invergasa with fictitious brokerage documents, false names, false identities, and impersonations of principals of their purported clients and of employees of brokerage firms. *Id.* ¶¶ 28–32. The Superseding Indictment states that Defendants "[r]eceived approximately $40 million from claims administrators based on false, fraudulent, and materially misrepresented claims they made on behalf of" Nimello, Quartis, and Invergasa and that Defendants deposited these proceeds in bank accounts which Defendants controlled. *Id.* ¶¶ 34–35.

The substantive wire fraud charged in Counts Two through Five incorporated the factual allegations from the conspiracy charged in Count One. *See* ECF No. 108, Counts Two Through Five, ¶ 3. These wire fraud counts specifically allege that Defendants made false and fraudulent claims on behalf of Nimello, Quartis, and Invergasa, three of Alpha Plus's clients, to claims administrators in the Eastern District of Pennsylvania, and the wirings identified as executions of the scheme involved communications relating to Nimello, Quartis, and/or Invergasa. *See* ECF No.

108, Counts Two Through Five. Count Six charged a money laundering conspiracy, and Counts Eleven and Twelve charged the substantive money laundering based on Defendants' disposition of the funds that they fraudulently obtained as a result of the schemes charged in Counts Two through Five. *See* ECF No. 108, Count Six, Counts Eleven Through Twelve.

Leading up to Cammarata's trial, numerous motions were filed, which concern many of the same issues raised by Cammarata in his Motion (ECF No. 264). On October 4, 2022, Cammarata moved for a Bill of Particulars, requesting the Government identify: "(1) each of the claims that the Government contends was fraudulent; (2) all alleged victims; and (3) each of the individuals whom the Government contends was impersonated, which of the Defendants engaged in such impersonation, and which communications the Government contends were the subject of the alleged impersonations." ECF No. 132 at 2. On October 6, 2022, this Court denied Cammarata's Motion for a Bill of Particulars "as the Superseding Indictment sufficiently lays out the elements of the crimes charged and adequately apprises [] Cammarata of the allegations against him by setting forth specific and clear allegations that enable [] Cammarata to adequately prepare a defense, to avoid surprise at trial, and to avoid the later risk of double jeopardy." ECF Nos. 137, 144 at 1.

Additionally, on October 11, 2022, Cammarata filed a Motion in Limine to "(1) preclude the government from using evidence it belatedly produced weeks before trial in violation of this Court's scheduling order, (2) require the government to immediately produce any Brady materials and grand jury testimony of anticipated witnesses, regardless of whether that information is considered subject to the Jencks Act, (3) require the government to identify the Brady materials produced in the voluminous discovery, to which the government continues to add, and (4) preclude the government or its witnesses from referencing Mr. Cammarata's private island in the Bahamas."

ECF No. 143 at 1. On October 13, 2022, this Court: (1) denied Cammarata's request to preclude use of evidence produced after the discovery cutoff; (2) denied as moot Cammarata's request to require the production of additional *Brady* materials as the Government represented it complied with its *Brady* requirements; (3) denied Cammarata's request to require identification of *Brady* materials; (4) denied without prejudice Cammarata's request to preclude introduction of evidence regarding the private island. ECF No. 158.

On October 12, 2022, the Government moved to dismiss Counts Seven, Eight, Nine, and Ten of the Superseding Indictment, which all charged substantive money laundering violations under 18 U.S.C. § 1956. ECF No. 147. The Court granted the motion to dismiss Counts Seven, Eight, Nine, and Ten on October 13, 2022. ECF No. 157.

On October 19, 2022, Cammarata's trial began. At the close of the Government's case, on October 24, 2022, Cammarata moved for a directed verdict on all counts, and filed a brief in support of his motion that evening. ECF No. 186. The brief in support of Cammarata's Motion to Dismiss all Counts of the Superseding Indictment Pursuant to Federal Rule of Criminal Procedure 29, argued, in addition to the reasons stated on the record, that: (1) the Government failed to adduce sufficient evidence to carry its burden to show venue lies in the Eastern District of Pennsylvania as to Counts Six, Eleven, and Twelve; and (2) the Government failed to adduce sufficient evidence that the banks and brokerage firms at issue in Counts Six, Eleven, and Twelve are financial institutions involved in interstate commerce. ECF No. 186. The Government filed its opposition the next morning (ECF No. 187) and the Court denied Cammarata's Motion that same day (ECF

No. 189).[3] On October 26, 2022, the jury returned a verdict finding Cammarata guilty on all submitted counts (Counts One through Six and Eleven and Twelve). ECF No. 194.

At trial, Cohen and Punturieri, who both entered guilty pleas and cooperated with the Government, provided lengthy testimony, which laid out how Defendants executed their

---

[3]     Cammarata's Motion to Dismiss all Counts of the Superseding Indictment Pursuant to Federal Rule of Criminal Procedure 29 (ECF No. 186), which was filed by Cammarata's counsel, was denied because: (1) a rational trier of fact could conclude that the Government established venue for the money laundering counts by a preponderance of the evidence; and (2) a rational trier of fact could conclude that Cammarata engaged in a monetary transaction through a financial institution.

First, by statute, venue over substantive offenses under Sections 1956 and 1957 "may be brought in "(A) any district in which the financial or monetary transaction is conducted; or (B) any district where a prosecution for the underlying specified unlawful activity could be brought, if the defendant participated in the transfer of the proceeds of the specified unlawful activity from that district to the district where the financial or monetary transaction is conducted." 18 U.S.C. § 1956(i)(1). Venue for money laundering conspiracy is proper in any district that is proper for the substantive offense outlined above, or "in any other district where an act in furtherance of the attempt or conspiracy took place." 18 U.S.C. § 1956(i)(2). Accordingly, Cammarata could have been prosecuted for the substantive money laundering in any district where a prosecution for the underlying specified unlawful activity (here, wire fraud) could be brought "if the defendant participated in the transfer of the proceeds of the specified unlawful activity from that district [here EDPA] to the district where the financial or monetary transaction is conducted [here DNJ]." 18 U.S.C. § 1956(i)(1). Here, Cammarata participated in a scheme to defraud claims administrators and their claimants in the Eastern District of Pennsylvania, and he also participated in the transfer of the proceeds of that fraud from the Eastern District of Pennsylvania to the District of New Jersey. Therefore, a rational trier of fact could conclude the Government established venue for the money laundering counts by a preponderance of the evidence.

Second, as to the sufficiency of the evidence that the banks and brokerage firms in the money laundering counts were financial institutions involved in interstate commerce, courts have held that references on bank documents in evidence showing that the bank is federally insured is sufficient. *See, e.g.*, *United States v. Allen*, 88 F.3d 765, 769 (9th Cir. 1996) (the words "Member FDIC" on contemporaneous bank documents were sufficient to prove federal insurance status); *United States v. Iverson*, 818 F.3d 1015, 1026 (10th Cir. 2016) (mortgage-loan statements including the notation "JPMorgan Chase Bank, N.A. Member FDIC," "admitted without objection as business records of the bank, are strong corroboration that JPMorgan was FDIC insured both immediately before and immediately after the offense occurred."). The records introduced at trial are replete with evidence that the banks and brokerage firms were financial institutions involved in interstate commerce. Therefore, there was sufficient evidence for a rational trier of fact to conclude that Cammarata engaged in a monetary transaction through a financial institution.

fraudulent scheme. This testimony, along with other evidence introduced at trial, established that Cammarata, along with his co-defendants Cohen and Punturieri ran Alpha Plus, a securities class action claims aggregator. *See, e.g.*, ECF No. 208, Tr. 197:14–200:14. Specifically, Alpha Plus collected and submitted claims to claims administrators purportedly on behalf of their clients (*i.e.*, Nimello, Quartis, and Invergasa) who sought to receive funds from securities fraud class action settlements and SEC enforcement actions. *See, e.g.*, *id.* In making these claims, Defendants represented that Nimello, Quartis, and Invergasa actually purchased the subject shares themselves during the class period. *See, e.g.*, Gx-220A-1. In support of these false assertions, Defendants fabricated a backstory that these three clients were foreign hedge funds in order to explain the large number of trades by these entities. *See, e.g.*, ECF No. 207, Tr. 138:4–6; ECF No. 209, Tr. 93:20– 94:5; ECF No. 210, Tr. 113:20–23. However, evidence showed that in reality Cammarata and his co-defendants controlled Nimello, Quartis, and Invergasa and these so-called "clients" of theirs never engaged in the trading of securities involved in the class action settlements to which they submitted their claims but were merely shell companies. Cammarata, who testified at length at trial, acknowledged these companies did not engage in the trading of securities involved in the class action settlements to which they submitted their claims. *See, e.g.*, ECF No. 211, Tr. 57:13– 18.

In support of its claims, Alpha Plus generally submitted spreadsheets to claims administrators to show the purported trading activity by these three clients. On numerous occasions, claims administrators requested Alpha Plus supply supporting documentation for the trading activity summarized in these spreadsheets, generally so that the claims administrators could see that Alpha Plus's clients actually owned the shares that they had claimed they owned in connection with their submitted claims. *See, e.g.*, ECF No. 209, Tr. 74:25–79:22. In response,

Defendants created false documents to support their claims that they had submitted on behalf of their "clients." Testimony by Cammarata's co-conspirators Cohen and Punturieri at trial, along with various other witnesses and the admission of many of the false documents at trial, confirm this is what occurred. *See, e.g.*, Gx-220A-2.

The Government introduced email correspondence from Defendants, showing, among other things, that Punturieri, using an email address in his own name or that of an alias, "Paul Delfino," communicated with administrators about the claims made by Alpha Plus on behalf of Nimello and Quartis. *See, e.g.*, ECF No. 209, Tr. 59–62. When the claims administrators would question the claims submitted or request additional information, Punturieri frequently communicated with Cammarata and Cohen seeking direction on how to respond. *See, e.g.*, *id.* Emails show that Cammarata, on numerous occasions, drafted a response for Punturieri to send as though the response was coming from a third party, such as from one of the principals of purported clients Nimello or Quartis. *See, e.g.*, *id.* One particular email from Cammarata to Paul Delfino, which copied Cohen, stated, *inter alia*, "I didn't have your Paul email when I woke up in the middle of the night thinking about JAIL, because we waited a week to hear anything from the admin." *See* Gx-216.

Additionally, Stephen Dickson, who knew and was friendly with Cammarata because Cammarata was a client of an insurance company Dickson was involved with, testified at trial and explained that emails purportedly sent between Cammarata and Dickson were entirely fabricated. *See* ECF No. 207, Tr. 208–212; Gx-17A, 17B, Gx-211, 212, 214. Evidence revealed that these fabricated emails were composed by Cammarata and Cohen in order to support their false claims, and then Defendants submitted these emails to a claim's administrator for that purpose. *See* ECF No. 208, Tr. 254–258.

The Government also put forth testimony and evidence from Dan Dearden, a fraud investigator at KCC Class Action Services, who pro-actively cooperated with the Government. *See* ECF No. 208, Tr. 46–196. KCC Class Action Services was the claims administrator for claims made on the Endochoice Securities Litigation Fund, and KCC received claims from Alpha Plus on behalf of Nimello, Quartis and Invergasa. *See id.*; *see also* Gx-287. When KCC emailed Punturieri's alias requesting supporting data for the trades Alpha Plus claimed substantiated Nimello and Quartis' claims, Punturieri replied with position reports for Nimello and Quartis, which purportedly came from Speedroute LLC, a New York-based broker dealer. *See* Gx-287, 287A, 288, 288A. Dearden sent a copy of the Nimello position report to Speedroute in attempt to verify the record, to which the Chief Compliance Officer of Speedroute replied that they could not validate the positions provided in the reports nor did they regularly produce position reports of the type provided. *See* Gx-290, 290A, 292. Testimony by Alex Vlastakis, the President of Spreedroute, confirmed that Speedroute never produced reports like those submitted on behalf of Alpha Plus's "clients" and that Quartis and Nimello were never clients of Speedroute. *See* ECF No. 209, Tr. 266–272.

Evidence also established that Punturieri sent to KCC several statements from Gentem Capital (a former name of a brokerage firm that Defendants bought in 2019) that purported to establish trading by Invergasa in Endochoice Holdings, Inc. *See* Gx-289, 289A. Dearden left a message for Gentem Capital seeking information regarding the trades ostensibly made by Invergasa, and he received a call back from "Mike" from Gentem Capital (who was actually Punturieri) saying that he could not answer the questions but would put him in touch with someone who could. *See* Gx-250, 251; *see also* ECF No. 208, Tr. 82–85. A recorded conversation between Dearden and Cammarata followed this, where Dearden spoke about getting supporting data from

clearing firms regarding the trades made by broker dealers on behalf of clients such as Nimello, Quartis, and Invergasa. *See* Gx-258; *see also* ECF No. 208, Tr. 125–140. During this conversation, Cammarata made a number of false statements: he falsely denied ever working for Alpha Plus; he falsely claimed that Nimello and Quartis had been his clients when he owned Speedroute, that they are no longer clients of Speedroute, and that Nimello and Quartis shut down operations a long time ago; and he falsely said that Invergasa's trades cleared through APEX Clearing or Cor Clearing. *See id.* Neither Apex nor Cor has any records of Invergasa ever being a client. During his testimony, Cammarata admitted to lying on this call with Dearden. *See, e.g.*, ECF No. 211, Tr. 105:4–8; 131:3–5.

Defendants exchanged text messages and messages on WhatsApp as part of their ongoing attempt to keep Dearden from learning of their scheme. These messages discussed bribing Dearden to keep their scheme secret, and Cammarata suggested paying off a Speedroute employee to verify the trading by Nimello and Quartis. *See* Gx-21. Additionally, messages indicated that Dearden contacted Cammarata's business partner, Juan Pablo Gomez, about Invergasa's trading and Cammarata suggested they get on a call Gomez so they could "get [] Pablo's story straight." *See* Gx-22. After Gomez spoke with Dearden and admitted Camamrata was associated with Alpha Plus, Cammarata indicated, in a WhatsApp message between Defendants, he could not call Dearden again because it would raise more suspicions now that Gomez had let it slip that Cammarata was affiliated with Alpha Plus. *See* Gx-21. During his testimony, Cammarata admitted to sending these messages. *See, e.g.*, ECF No. 211, Tr. 223–225.

After hearing and seeing the above evidence (and more), the jury found Cammarata guilty on all submitted counts (Counts One through Six and Eleven and Twelve). ECF No. 194. Following this jury verdict, the Court granted a series of orders extending the time for filing post-

trial motions and also permitted Cammarata to file a *pro se*/hybrid post-trial motion.[4] ECF Nos. 203, 230, 240, 252, 263. Accordingly, on February 21, 2023, Cammarata filed a *Pro Se*/Hybrid Supplemental Motion for Judgment of Acquittal under Rule 29 of the Federal Rules of Criminal Procedure, or in the Alternative, a Motion for A New Trial under Rule 33 of the Federal Rules of Criminal Procedure. ECF No. 264. The Government filed a response in opposition on March 16, 2023 (ECF No. 267), and Mr. Cammarata filed a reply on April 3, 2023 (ECF No. 274).[5]

## II.    STANDARDS OF REVIEW

### A.    Motion for Acquittal

Federal Rule of Criminal Procedure 29 provides that a district court, upon a defendant's motion or on its own, shall "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29. In deciding a post-verdict motion for judgment of acquittal under Federal Rule of Criminal Procedure 29, "a district court must 'review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence.'" *United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002) (quoting *United States v. Wolfe*, 245 F.3d 257, 262 (3d Cir. 2001)). "The court is required to 'draw all reasonable inferences in favor of the

---

[4]    *See supra* at n.1.

[5]    Prior to filing his Reply on April 3, 2023, Cammarata filed a Petition to Deem Any Government Response to the Outstanding Motion for Judgment of Acquittal as Untimely, or to Supplement the 29(c) Motion (ECF No. 271). As an alternative to striking any response by the Government to the pending Rule 29(c) Motion, Cammarata requested this Motion be used to "supplement or provide an anticipatory reply." ECF No. 271 at 1. The predictive reply argues that "the elements for a conviction were never met;" rather, the Government "just *told* the jury the elements were met, never *showed* them." *Id.* at 3, 4. The Court denied Cammarata's request to deem the Government's response untimely but granted Cammarata's request to supplement his Rule 29(c) Motion, indicating it would consider his already filed petition (ECF No. 271) but would also allow him to submit a final *pro se* reply. ECF No. 273. The Court has thoroughly reviewed both Cammarata's preemptive reply (ECF No. 271) and his reply (ECF No. 274).

jury's verdict.'" *Id.* (quoting *United States v. Anderskow*, 88 F.3d 245, 251 (3d Cir. 1996)). Accordingly, a finding of insufficiency should "be confined to cases where the prosecution's failure is clear." *United States v. Leon*, 739 F.2d 885, 891 (3d Cir. 1984) (internal quotation marks and citation omitted). On such motions, the court may not usurp the jury's role "by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005) (citations omitted).

### B. Motion for a New Trial

Federal Rule of Criminal Procedure 33(a) provides that a "court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "Although the standard of review for a motion for a new trial is broader than that for acquittal, motions for new trials are disfavored and are only granted with great caution and at the discretion of the trial court." *United States v. Martinez*, 69 F. App'x 513, 516 (3d Cir. 2003) (citing *United States v. Allen,* 554 F.2d 398, 403 (10th Cir. 1977)). A district court can "grant a defendant a new trial only if it finds that 'there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted.'" *United States v. Rich*, 326 F. Supp. 2d 670, 673 (E.D. Pa. 2004) (quoting *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002)). "Additionally, the court must grant a new trial if errors occurred during the trial, and it is reasonably possible that such error, or combination of errors, substantially influenced the jury's decision." *Id.* (citing *United States v. Copple*, 24 F.3d 535, 547 n.17 (3d Cir. 1994)).

### III. DISCUSSION

Cammarata, over the course of ninety-six pages in his initial Motion and fifty-four pages in his Reply, details a host of complaints that he argues entitle him to acquittal or a new trial. Because the money laundering counts are dependent on a finding of fraud, Cammarata's arguments

only concern Counts One through Five, the substantive fraud counts. *See* ECF No. 264 at 33. Therefore, the Court will only examine the substantive fraud counts. After a thorough review of Cammarata's arguments concerning these Counts, the Court considers Cammarata's Motion as putting forth three main arguments: (1) there was a variance or constructive amendment of the indictment; (2) there was insufficient evidence; and (3) there was misconduct.[6] As detailed below, the Court finds none of Cammarata's arguments entitle him to acquittal or a new trial.

---

[6]     Cammarata took a kitchen-sink approach in his post-trial submissions and moreover, raised many issues for the first time in his Reply. "A reply brief is intended only to provide an opportunity to respond to the arguments raised in the response brief; it is not intended as a forum to raise new issues." *United States v. Martin*, 454 F. Supp. 2d 278, 281 n.3 (E.D. Pa. 2006) (citations omitted). Nevertheless, in light of the fact that Cammarata is proceeding by way of hybrid representation in post-trial motions, the Court will briefly consider a few of the newly-raised issues and explain why the Court finds them meritless.

First, Cammarata argues that the wire fraud statute is so vague and ambiguous such that it violates due process. ECF No. 274 at 2. Cammarata states that "[s]omeone could easily be convicted under the statute of misstating their eye color or height in a financial application or document" and that "the statute encourages and requires arbitrary enforcement," which is what happened in his case as "[t]he indictment, grand jury, and trial jury relied on two different interpretations." *Id.* at 2–3. The Court does not find the wire fraud statute to be unconstitutionally vague. *See, e.g.*, *United States v. Hook*, 195 F.3d 299, 310 (7th Cir. 1999) (finding wire fraud statute constitutional as within the extensive reach of the Commerce Clause); *United States v. Conner*, 752 F.2d 566, 574 (11th Cir. 1985) (rejecting defendant's claim that the mail and wire fraud statutes were unconstitutional, finding "[t]here is no merit in the claim of unconstitutionality"). Furthermore, where a claimant raises a vagueness challenge, the Court considers the statute not on its face but as applied to the facts of the case. *See Chapman v. United States*, 500 U.S. 453, 468 (1991); *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988). As applied to the facts of this case, the Court does not find the wire fraud statute unconstitutionally vague. Contrary to Cammarata's assertions, this case represents a straightforward application of the wire fraud statute. The plain language of the statute put the defendant on notice that he could be subject to criminal punishment for devising a scheme to defraud claims administrators (and the parties to the underlying settlements for whom they worked out), or to obtain money or property from the claims administrators (and the parties to the underlying settlements for whom they worked out) by means of false and fraudulent representations, if the scheme involved interstate wire transmissions. Accordingly, the Court finds this argument meritless.

Second, Cammarata argues his criminal proceeding amounted to selective prosecution because there is clear evidence that the government's prosecutorial policy has a "discriminatory effect" and is "motivated by a discriminatory purpose." ECF No. 274 at 9 (quoting *United States*

### A.      Arguments Concerning a Variance or Constructive Amendment of the Indictment

Cammarata argues that the Government's proofs at trial constituted a prejudicial variance

from the Superseding Indictment or there was a constructive amendment of the Superseding

Indictment. ECF No. 264 at 23; ECF No. 274 at 4. "The Fifth Amendment provides that '[n]o

person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment

---

*v. Armstrong*, 517 U.S. 456, 464 (1996)). Again, the Court finds this argument meritless. "The Equal Protection Clause prohibits selective enforcement 'based upon an unjustifiable standard such as race, religion, or other arbitrary classification.'" *United States v. Batchelder*, 442 U.S. 114, 125 n.9 (citation omitted). It "is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *Armstrong*, 517 U.S. at 463. Moreover, "[i]n the ordinary case, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Id.* at 462 (internal quotation marks and citation omitted). Here, Cammarata claims he was discriminated against because he was treated differently than his co-defendants, who both cooperated and entered early pleas in this case. ECF No. 274 at 9–14. It is unclear what "arbitrary classification" Cammarata argues the Government employed in allegedly treating Cammarata different than his co-defendants as Cammarata has presented no evidence of an unconstitutional motive by the Government. ECF No. 274 at 9–14. Accordingly, the Court finds Cammarata's claims of selective prosecution meritless.

Cammarata also argues that his criminal proceeding amounted to vindictive prosecution because the Government filed a Superseding Indictment after Cammarata did not accept a plea deal. ECF No. 274 at 14–17. "Although the government may not retaliate against a defendant for exercising legal rights, 'in the give and take of plea bargaining, there is no such element of punishment or retaliation so long as the accused is free to accept or reject the prosecution's offer.'" *United States v. Dufresne*, 58 F. App'x 890, 895 (3d Cir. 2003) (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978)). In *Bordenkircher,* the Supreme Court held that there was no vindictive prosecution when the prosecutor, after the defendant refused to plead guilty to the original charges carrying a sentence of two to ten years incarceration, indicted the defendant under a recidivist statute carrying a mandatory life term. *Id.* (citing *Bordenkircher*, 434 U.S. at 358–59, 365). Therefore, even if the Government filed the Superseding Indictment because Cammarata "failed to cooperate, the prosecution was not vindictive or in retaliation for refusing to cooperate." *Id.* at 896 (finding defendant's claim of vindictive prosecution based on the belief that government indicted him because he failed to cooperate meritless); *see also United States v. Baskerville*, No. 03-cr-836, 2007 WL 150439, at *3 (D.N.J. Jan. 17, 2007) ("Simply  put, due process does not prohibit a prosecutor from bringing additional charges against a defendant who refused to plead guilty to an offense with which he was originally charged or who refused to cooperate with authorities."). Thus, the Court finds this argument meritless.

or indictment of a Grand Jury.'" *United States v. Centeno*, 793 F.3d 378, 389 (3d Cir. 2015) (quoting U.S. Const. amend. V.). "Because of this constitutional guarantee, a court cannot permit a defendant to be tried on charges that are not made in the indictment against him." *United States v. Vosburgh*, 602 F.3d 512, 531 (3d Cir. 2010) (internal quotation marks and citation omitted). "From this rule comes the general prohibition against constructive amendments." *Id.* (citation omitted).

"An indictment is constructively amended when, in the absence of a formal amendment, the evidence and jury instructions at trial modify essential terms of the charged offense in such a way that there is a substantial likelihood that the jury may have convicted the defendant for an offense differing from the offense the indictment returned by the grand jury actually charged." *Id.* at 532 (quoting *United States v. Daraio*, 445 F.3d 253, 259–60 (3d Cir. 2006)). "An indictment can be constructively amended through 'evidence, arguments, or the district court's jury instructions,' if they 'effectively amend the indictment by broadening the possible bases for conviction from that which appeared in the indictment.'" *Id.* (quoting *United States v. McKee*, 506 F.3d 225, 229 (3d Cir. 2007)). "When considering a claim of constructive amendment, the 'key inquiry is whether the defendant was convicted of the same conduct for which he was indicted.'" *Id.* (quoting *Daraio*, 445 F.3d at 260). There is no constructive amendment when "a defendant is convicted of the same offense that was charged in the indictment." *Id.* (citation omitted). A constructive amendment is "per se reversible under harmless error review, [and] [is] presumptively prejudicial under plain error review." *Id.* (internal quotation marks and citation omitted).

A variance is similar to a constructive amendment as it also involves differences between the charges in the Indictment and the evidence at trial. *Id.* (quoting *Daraio*, 445 F.3d at 259). "A variance occurs 'where the charging terms of the indictment are not changed but when the evidence

at the trial proves facts materially different from those alleged in the indictment.'" *Id.* (quoting *Daraio*, 445 F.3d at 259). "A variance that sufficiently informs the defendant of the charges against him and allows him to prepare his defense without being misled or surprised at trial does not prejudice the defendant's substantial rights." *Id.* (citation omitted). Unlike constructive amendments, "[n]ot all variances constitute reversible error." *Id.* Rather, "a variance can result in a reversible error only if it is likely to have surprised or otherwise has prejudiced the defense." *Daraio*, 445 F.3d at 262 (citation omitted).

In his Motion, Cammarata claims that the proofs at his trial varied from the Superseding Indictment and he was prejudiced as a result, and in his Reply, he claims that the Superseding Indictment was constructively amended. *See* ECF No. 264 at 24; ECF No. 274 at 4. First, Cammarata argues that the Government's failure to indicate each piece of evidence it submitted at trial in the Superseding Indictment amounted to variances prejudicing his defense. *See, e.g.*, ECF No. 264 at 24 (arguing introduction of tax evidence was a variance); *see id.* at 24–25 (arguing Government's characterization of Cammarata as the "leader" or "Alpha dog" were variances). But an indictment is not required to be a recitation of all the evidence that the Government will present at trial; rather, pursuant to the Federal Rules of Criminal Procedure, an indictment simply must "be a plain, concise, and definite written statement of the essential facts constituting the offense charged," and "[a] count may incorporate by reference an allegation made in another count." Fed. R. Crim. P. 7(c)(1). Accordingly, an indictment will generally satisfy the requirements of the Rules "where it informs the defendant of the statute he is charged with violating, lists the elements of a violation under the statute, and specifies the time period during which the violations occurred." *United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012) (citations omitted). Here, the Government supplied Cammarata's counsel with ample discovery addressing all of the evidence presented at

trial.[7] Therefore, there was no unfairness or surprise at trial as Cammarata was convicted of the same conduct charged in the Superseding Indictment.

Apart from arguments concerning specific pieces of evidence presented at trial, Cammarata argues that "the most destructive variant from the Superseding indictment were the materially false and misleading representations presented to the grand jury and the trial jury" concerning the elements and accusations/charges. ECF No. 264 at 25. Specifically, Cammarata points to paragraph eleven in Count One of the Superseding Indictment, which states, in part, "[a]ll claimants to such settlements, including those represented by claims aggregators such as Alpha Plus, were required to show two essential facts in order to qualify for an award of settlement funds." ECF No. 108, Count One ¶ 11. Cammarata states that this Paragraph contains "incorrect and misleading essential facts," which were "repeated continuously throughout the superseding indictment, trial, and closing arguments by the government even though every witness testifying and all the evidence adduced at trial proved that these 'essential' requirements were egregiously wrong and it certainly confused the grand jury and . . . misled the trial jury." ECF No. 264 at 26. Such a statement by Cammarata concedes that the Government's theory of guilt was consistent

---

[7]    As indicated *supra*, on October 11, 2022, Cammarata filed a Motion in Limine, in which the defense stated that it has raised numerous concerns about Mr. Cammarata's limited access to discovery while detained. *See supra* at 4–5; *see also* ECF No. 143 at 5, n.8. In this case, the Government complied with its obligations to provide discovery to defense counsel and also made arrangements to furnish Cammarata with his own laptop computer in the Federal Detention Center so that Cammarata could personally review his discovery. *See, e.g.*, ECF No. 267 at 19 n.4. Cammarata's Motion for Acquittal raises again the issue of his inability to personally review discovery. *See, e.g.*, ECF No. 264 at 55. However, as Cammarata was represented by defense counsel, there is no constitutional requirement that Cammarata himself must personally be given the opportunity to review the materials. *See, e.g.*, *United States v. Faulkner*, No. 09-249, 2011 WL 3962513, at *4 (N.D. Tex., Sept. 8, 2011) (noting an absence of authority for the argument that "to be ensured effective assistance of counsel, a defendant must be able to *personally* review all of the relevant discovery before trial."); *see also United States v. Thompson*, No. 10-200, 2013 WL 1809659, at *6 (D. Me. Apr. 29, 2013) ("There is no general constitutional right to discovery of the evidence supporting the prosecution."), *aff'd*, 851 F.3d 129 (1st Cir. 2017).

from the grand jury, through indictment and at trial. Accordingly, this argument concerning the "most destructive variant" is baseless.

Cammarata additionally argues that the Superseding Indictment was constructively amended and/or a variance occurred because the Superseding Indictment did not include the word "material" in defining the elements of wire fraud. ECF No. 274 at 4. But a constructive amendment occurs if the indictment is effectively amended by *broadening* the possible bases for conviction from which appeared in the indictment. Here, the Superseding Indictment sufficiently informed Cammarata of the charges against him and allowed him to prepare his defense. Moreover, even if the Superseding Indictment did not state that materiality was an element of the crime, that would not be a constructive amendment because that does not broaden the possible bases for conviction from that which appeared in the indictment but rather tightens the possible bases.

Cammarata also repeatedly argues that the evidence at trial showed that the stock trades that formed the bases for Alpha Plus's class action settlement claims were real and not fake. *See, e.g.*, ECF No. 264 at 29, 48, 75, 81, 86, 88–89; *see also e.g.*, ECF No. 274 at 26. However, the Superseding Indictment was not limited to "fake" stock trades; rather, it charged that Defendants conspired to and executed a scheme to defraud claims administrators "by means of false and fraudulent pretenses, representations, and promises." ECF No. 108, Count One, ¶ 23, Counts Two Through Five, ¶ 2.

The Superseding Indictment specified some of the types of false pretenses and representations in which Defendants had engaged, including that they had: (1) caused Alpha Plus to submit claims on behalf of Nimello, Quartis, and Invergasa, which falsely and fraudulently represented that Nimello, Quartis, and Invergasa had purchased and sold securities that were the subject of class action lawsuits or SEC enforcement actions; (2) used false names of supposed

Alpha Plus employees when communicating with claims administrators; (3) created fictitious brokerage documents purporting to show purchases and sales of securities subject to class action and SEC enforcement action settlements; (4) provided fictitious brokerage documents to claims administrators to support false and fraudulent claims; (5) impersonated individuals purportedly in control of Alpha Plus clients in communications with claims administrators who were attempting to determine the legitimacy of claims submitted by Alpha Plus; (6) impersonated individuals purportedly employed by brokerage firms in conversations with claims administrators who were attempting to determine the legitimacy of claims submitted by Alpha Plus; and (7) falsely denied ownership or control of Alpha Plus in conversations with claims administrators who were attempting to determine the legitimacy of claims submitted by Alpha Plus. ECF No. 108, Count One, ¶¶ 27–33. Thus, nowhere in the Superseding Indictment did the Government allege that the underlying stock trades did not occur, and accordingly, the Superseding Indictment was not in any way limited to fake or fictional stock trades.

In contrast, the charging instrument required only that: (1) defendants submitted claims to claims administrators through Alpha Plus and (2) that these claims were supported by materially false pretenses, representations, or promises. At trial, the Government showed exactly this, by putting forth evidence that: (1) Cammarata and his two partners submitted thousands of claims to claims administrators (including some on the Eastern District of Pennsylvania) on behalf of purported Alpha Plus clients Nimello, Quartis, and Invergasa; (2) the submitted claims falsely represented to the claims administrators that Nimello, Quartis, or Invergasa had carried out the underlying stock trades; and (3) when the claims administrators rejected claims or sought further information, Defendants engaged—both individually and collectively—in false and deceptive conduct including fabricating documents, disclaiming their connection to each other and Alpha

Plus, and fabricating correspondence and communications from individuals purportedly in control of Alpha Plus's "clients" Nimello, Quartis, and Invergasa. Therefore, there was no divergence between the Superseding Indictment and the evidence presented at trial.

Accordingly, Cammarata has not met the burden of establishing the existence of the kind of constructive amendment or prejudicial variance needed to undermine his conviction.

### B.   Arguments Concerning Sufficiency of the Evidence

Cammarata also argues that there was insufficient evidence to find him guilty of fraud. *See, e.g.*, ECF No. 264 at 34–49. According to Cammarata: (1) he owned all the trade-data representing the trades on which Alpha Plus's claims were made; (2) he personally assigned his settlement rights in the trade data to Quartis and Nimello, while he, Cohen, and Punturieri assigned their collective rights to Invergasa; (3) these assignments made Quartis, Nimello, and Invergasa the "beneficial owners" and proper claimants; (4) all of the trades were real; and (5) all of the documents submitted in support of Alpha Plus's claims were accurate. Cammarata specifically laid out this account of the facts at trial when he testified. *See generally* ECF No. 211, Tr. 7–111. The jury, therefore, specifically considered the credibility and weight to give this testimony and his version of events.

However, the jury was also presented with ample evidence that told a different story than the one Cammarata presented. The jury was presented with testimony by both of Cammarata's co-conspirators and documented evidence of fabricated documentation submitted to claims administrators. Cohen and Punturieri both testified that they fabricated backup documentation when claims administrators questioned Alpha Plus's submissions and they had to fabricate these documents because real documentation to support the claims did not exist as those trades had been made by other people. They further testified that they purchased trade data on the open market in

order to fabricate claims for Invergasa, and Cohen testified that he altered and manipulated this data in order to make detection of their fraud more difficult.

Cammarata takes strong issue with specifically Cohen's testimony, arguing Cohen did not testify truthfully. However, the Third Circuit has held that even "uncorroborated accomplice testimony may constitutionally provide the exclusive basis for a criminal conviction." *United States v. Perez*, 280 F.3d 318, 344 (internal quotation marks and citation omitted). Moreover, defense counsel had ample opportunity to (and did) cross-examine all of the Government's witnesses, including Cohen and Punturieri, Cammarata's co-conspirators with whom the Government made plea agreements. Additionally, the jury was specifically instructed as to its role in weighing witnesses' testimony and credibility. *See* Mod. Crim. Jury Instr. 3rd Cir. 3.04 (2021) (credibility of witnesses). Thus, the jury's decision to credit the Government's case, including Cohen and Punturieri's testimony, over Cammarata's testimony was within its province.

As stated *supra*, in ruling on a motion for judgment of acquittal, the Court must "view the evidence in the light most favorable to the verdict, and must presume that the jury has properly carried out its functions of evaluating credibility of witnesses, finding the facts, and drawing justifiable inferences." *United States v. Lacy*, 446 F.3d 448, 451 (3d Cir. 2006) (internal quotation marks omitted). Moreover, the Court must be "vigilant . . . not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that a jury" and accordingly, "a finding of insufficiency should be confined to cases where the prosecution's failure is clear." *Brodie*, 403 F.3d at 133; *Smith*, 294 F.3d at 477 (internal quotation marks and citation omitted). Here, there is no evidence of the prosecution's failure, and the Court may not usurp the jury's role in assigning weight to the evidence.

In the present case, the Government offered evidence from which a rational trier of fact could find Cammarata guilty beyond a reasonable doubt. To find Cammarata guilty of Count One, conspiracy to commit mail fraud or wire fraud, the jury was required to find three elements beyond a reasonable doubt: (1) that two or more persons agreed to commit mail and/or wire fraud, as charged in the Superseding Indictment; (2) that Cammarata was a party to or a member of that agreement; and (3) that Cammarata joined the agreement or conspiracy knowing of its objectives to commit mail and/or wire fraud and intending to join together with at least one other alleged conspirator to achieve that objective; that is, that the defendant and at least one other alleged conspirator shared a unity of purpose and the intent to achieve a common goal or objective, to commit mail and/or wire fraud. *See* Mod. Crim. Jury Instr. 3rd Cir. 6.18.371A (2021). To find Cammarata guilty of Counts Two Through Five, wire fraud, the jury had to find the Government proved the following three elements beyond a reasonable doubt: (1) that Cammarata knowingly devised a scheme to defraud and to obtain money or property by materially false or fraudulent pretenses, representations or promises or willfully participated in such a scheme with knowledge of its fraudulent nature; (2) that Cammarata acted with the intent to defraud, that is to deceive and cheat; and (3) that in advancing, furthering, or carrying out the scheme, Cammarata transmitted any writing, signal, or sound by means of a wire, radio, or television communication in interstate commerce or caused the transmission of any writing, signal, or sound of some kind by means of a wire, radio, or television communication in interstate commerce. *See* Mod. Crim. Jury Instr. 3rd Cir. 6.18.1343 (2021).

In the present case, the Government offered extensive testimony of Cammarata's co-conspirators, along with other testimony and documented evidence. The Court has laid out a

sampling of this evidence in the Background and Procedural History Section. *See supra* at 5–9. Based on the evidence presented, the Court finds the evidence sufficient to sustain the conviction.

### C.    Arguments Concerning Misconduct

Cammarata puts forth additional arguments concerning misconduct which the Court considers best viewed as support for his request for a new trial. However, none of these arguments convince the Court that "there is a serious danger that a miscarriage of justice occurred" such that "an innocent person has been convicted" or errors during trial "substantially influenced the jury's decision." *See Rich*, 326 F. Supp. 2d at 673 (citations omitted).

First, as enumerated in this Court's discussion of the sufficiency of the evidence, there is no serious danger that an innocent person has been convicted. Given the testimony, the fabricated and falsified documents presented as exhibits, and Cammarata's own emails and text messages, there is ample evidence establishing Cammarata's guilt. Thus, the Court finds no reason to order a new trial based on the weight of the evidence.

Cammarata also takes issue with his jury. He asserts that the jury was not capable of understanding the complicated nature of the securities industry, that the jury was subject to outside influences, prejudice against him, and eager to finish. *See, e.g.*, ECF No. 264 at 2, 53–54. First, "[w]e presume that juries understand and carefully follow instructions." *United States v. Detelich*, 351 F. App'x 616, 622 (3d Cir. 2009) (citations omitted). Additionally, this Court has not been presented with any evidence substantiating any of Cammarata's claims of an incompetent jury. Rather, this Court echoes the observations of the Government that the jury was attentive and engaged throughout their service. *See* ECF No. 267 at 29. Accordingly, this Court rejects Cammarata's argument for a new trial based on his allegations with respect to the jury.

Next, Cammarata argues that law enforcement engaged in misconduct. *See, e.g.*, ECF No. 264 at 12–15. The Federal Agents who searched Alpha Plus's offices did not seize every piece of computer equipment and, accordingly, co-defendant Cohen later turned over to the FBI some unseized computer evidence he found when he was clearing out Alpha Plus's office in anticipation of the landlord retaking possession. According to Cammarata, the agent's failure to take all of the equipment at the time of the search provided Cohen with an opportunity to tamper with the evidence, which, according to Cammarata, Cohen did. But there is no obligation for law enforcement to seize every piece of evidence available when executing a search warrant. Additionally, retrieving such overlooked evidence later from a cooperating witness is not misconduct. Nevertheless, Cammarata presented these allegations of evidence tampering during his testimony at trial; thus, the jury considered and rejected Cammarata's story. *See, e.g.*, ECF No. 211, Tr. 149:24–150:5. The Court similarly rejects these arguments and finds there was substantial independent evidence from which to convict Cammarata. Accordingly, the Court denies Cammarata's request for a new trial on the basis of law enforcement misconduct.

Cammarata also claims that the Government's closing arguments were improper and inflammatory. *See* ECF No. 264 at 1–2, 33, 38, 44, 49–50, 63. "Improprieties in a prosecutor's remarks warrant a new trial only if they are so gross that there is a probability of prejudice to the defendant[] and such prejudice was not neutralized by the court." *United States v. Gaines*, 726 F. Supp. 1457, 1469 (E.D. Pa. 1989) (internal citation omitted), *aff'd*, 902 F.2d 1562 (3d Cir. 1990). Thus, "[w]hile a prosecutor's comments during closing arguments must be directed to an understanding of the facts and of the law rather than to passion and prejudice, [] the prosecution is accorded reasonable latitude and may employ oratorical flair arguing its version of the case to the jury." *Glass v. Wetzel*, No. 16-3902, 2016 WL 9132009, at *5 (E.D. Pa. Dec. 14, 2016) (internal

quotation marks and citations omitted). Here, Cammarata once again takes issue with the Government's closing because it is not his version of events. However, the Government's closing was based on the evidence admitted at trial and certainly did not "infect[] the trial with [any] unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). Thus, Cammarata's request for a new trial based on improper closing arguments is denied.

## IV.     CONCLUSION

For the foregoing reasons, Cammarata's *Pro Se*/Hybrid Supplemental Motion for a Judgment of Acquittal under Rule 29 of the Federal Rules of Criminal Procedure, or in the Alternative, a Motion for a New Trial under Rule 33 of the Federal Rules of Criminal Procedure (ECF No. 264) will be denied. An appropriate Order will follow.

**BY THE COURT:**

**/s/ Chad F. Kenney**

_____

**CHAD F. KENNEY, JUDGE**

Cc:    Counsel

        Pro se